| | | |
|---|---|---|
| RICKEY COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 2388 |
| | ) | |
| COOK COUNTY, a unit of local | ) | |
| Government; and EARL DUNLAP, | ) | |
| the Transitional Administrator for | ) | |
| the Juvenile Temporary Detention Center, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On July 20, 2011, Plaintiff Rickey Coleman ("Mr. Coleman") filed a two-count Third

Amended Complaint (Dkt. No. 62, "Am. Compl."), alleging that Defendants Cook County and

Earl Dunlap ("Mr. Dunlap") (collectively, "Defendants") failed to offer Mr. Coleman

preferential rehire options after he was terminated as an Administrative Assistant IV/Floor

Manager at the Cook County Juvenile Temporary Detention Center ("JTDC"). Mr. Coleman

contended this failure occurred because of his political affiliation, and according to Mr. Coleman

was in violation of Mr. Coleman's First Amendment rights, as protected by the Civil Rights Act,

42 U.S.C. § 1983 (2012) and the "*Shakman* Decree." *See Shakman v. Democratic Org. of Cook*

*County*, No. 69 C 2145 (N.D. Ill.).[1]

---

[1] In 1972, Cook County entered into a Consent Decree, which prohibited Cook County from, *inter alia,* "conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." (Dkt. No. 177, Pl's Rule 56.1(d)(3) Resp. Cook Cnty. Undisp. Facts, "Pl's Resp. Cook Cnty. Facts", at ¶ 12.) In 1994, Cook County entered into a Consent Decree which incorporated and extended the provisions of the 1972

The proceedings in this case were stayed on August 15, 2011, pending an interlocutory appeal to the Seventh Circuit regarding the question of Mr. Dunlap's qualified immunity. (Dkt. No. 85.) After a year's consideration, the Seventh Circuit issued its ruling on the appeal, affirming this court's decision denying qualified immunity. (Dkt. No. 93.) After the stay was lifted, this court on February 14, 2013 granted Cook County's motion to dismiss (Dkt. No. 99) Mr. Coleman's 42 U.S.C. § 1983 claim. (Dkt. No. 132.) The Court also limited Mr. Coleman's *Shakman* claim against Cook County to the events occurring in June 2007. (*Id.*)

Discovery then proceeded and was completed in November 2013. After several failed attempts to settle the case, Defendants filed motions for summary judgment on Mr. Coleman's remaining *Shakman* claims (Count I), (Dkt. Nos. 162, 166), which the parties have fully briefed. For the reasons set forth below, the court grants these motions, and enters judgment in favor of Defendants.

## **BACKGROUND**

**Mr. Coleman's Employment and Termination at the JTDC**

Mr. Coleman was hired by Cook County in 1988 as a Juvenile Detention Counselor at the JTDC. (Dkt. No. 178, Pl's Rule 56.1(d)(3)(A) Resp. Dunlap's Undisp. Facts, "Pl's Resp. Dunlap Facts", at ¶2.) By 2007, Mr. Coleman had been promoted to the position of Administrative Assistant IV/Floor Manager at JTDC. (*Id.*) Mr. Coleman was terminated from JTDC at the close of business on March 16, 2007. (*Id.* ¶ 3.)

The termination letter was sent from Kim David Gilmore, Chief of the Bureau of Human Resources for Cook County ("Mr. Gilmore"), and the letter stated Mr. Coleman's position was eliminated due to cuts in the JTDC budget that year. (*Id.*; *see also* Pl's Resp. Cook Cnty. Facts ¶

Consent Decree. (*Id.* ¶ 13) On November 30, 2006, Cook County entered into the Supplemental Relief Order which established a plan of compliance pursuant to the Consent Decrees. (*Id.*)

8.)  Subsequently, Mr. Coleman filed a *Shakman* claim on May 21, 2007, alleging that he was laid off as a result of political discrimination.  (Dkt. No. 202, Pl's Reply to Defs' Resp. to Pl's Add. Undis. Facts, "Pl's Add. Undisp. Facts", at ¶ 5.)[2]

Mr. Coleman was on disability leave when he received this termination letter in March 2007.  (Pl's Resp. Cook Cnty. Facts ¶ 21.)  Mr. Colemen went on disability leave and received disability compensation from approximately December 2006 through October 2007.  (*Id.* ¶ 20.)  Mr. Coleman took leave after entering the JTDC's Employee Assistance Program in December 2006 because of stress caused by his employment.  (*Id.* ¶ 19.)[3]

**Mr. Coleman's Former Supervisor Willie Ross**

Prior to his leave and termination, Mr. Coleman asserts that his immediate supervisor, Willie Ross, warned Mr. Coleman that he would lose his job if he did not support John Stroger, who was at the time Cook County Board President from 1994 to 2006 ("Stroger").  (Pl's Resp. Dunlap Facts ¶ 4; *see also* Pl's Resp. Cook Cnty. Facts ¶ 75.)  Willie Ross, however, was not Mr. Coleman's immediate supervisor in March 2007, and Willie Ross' employment at the JTDC had terminated almost two years earlier on April 22, 2005.  (Pl's Resp. Dunlap Facts ¶ 5.)

---

[2] Mr. Coleman's *Shakman* claim for his termination is not a part of this proceeding.  The court previously dismissed Mr. Coleman's *Shakman* claim for termination (Count I) with prejudice, pursuant to the doctrine of *res judicata*.  (Dkt. Nos. 55, MTD Order of June 22, 2011, at 2.)  As previously discussed, this claim was adjudicated on the merits.  (*Id.* at 15-18.)

[3] Without providing any additional support, Mr. Coleman cites his deposition testimony, in a conclusory fashion, to attempt to establish that two JTDC employees, J.W. Fairman and Robert Catchings ("Mr. Fairman" and "Catchings"), caused his mental stress by filing "false" charges against Mr. Coleman.  (Pl's Add. Undisp. Facts ¶ 6.)  Again, merely citing his deposition testimony, Mr. Coleman states that these charges were initially sustained by Robert Berger, a current Deputy Transitional Administrator at the JTDC ("Mr. Berger").  (*Id.* ¶ 7.)  In light of Plaintiff's failure to verify these facts at all, the court finds such conclusory, inappropriate for summary judgment, and declines to consider them.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (holding that conclusory statements of fact are afforded no weight at the summary judgment stage.)

Mr. Coleman admits that once Willie Ross left the JTDC, no one ever again suggested to Mr. Coleman that his employment at the JTDC depended on political support for Stroger, or any other political candidate or organization.  (*Id*. ¶ 6.)  Additionally, Mr. Coleman has admitted that Willie Ross was the only person at the JTDC, who ever suggested Mr. Coleman risked losing his job, for failure to do political work or make political contributions.  (*Id*. ¶ 7.)  Mr. Coleman also admits that he never communicated his political affiliations or political beliefs to anyone at any time, never told anyone whether he supported Stroger, and was never part of any political organization.  (Pl's Resp. Cook Cnty. Facts ¶¶ 11, 72-73.)

**Mr. Coleman's June 2007 Application**

In June 2007, Human Resources for Cook County posted Job Opportunity Notices for "Recreational Supervisor (JC 1622)" and "Supervisor of Juvenile Detention Counselors (JC 1598)" at the JTDC.  (*Id*. ¶¶ 23, 25.)  One of the minimum qualifications for these positions was that the applicant "must provide a sealed official copy of transcripts" upon filing an application.  (*Id*. ¶¶ 24, 26.)  This minimum qualification appeared in bold lettering.  (*Id*.)

Mr. Coleman was told about these  postings by a friend Vanessa McCain, who worked in the JTDC's HR department ("Ms. McCain").  (*Id*. ¶ 27; *see also* Dkt. No. 195, Def's Resp. to Pl's Rule 56.1(b)(3) Additional Facts, "Def's Resp. Pl's Facts", at ¶ 14.)  Mr. Coleman went to the Cook County Human Resources Department to apply for both positions on June 21, 2007, which was the last day of the application period.  (Pl's Resp. Cook Cnty. Facts ¶ 28.)  Mr. Coleman went to the County Building on Clark Street and tendered his applications.  (*Id*. ¶ 29.)  Mr. Coleman admits that the transcripts he submitted on June 21, 2007 were not in a sealed envelope that had been sealed by his college.  (*Id*. ¶ 42.)

Mr. Coleman's applications were initially refused by Ms. Eleanor Henry, a Human Resources employee ("Ms. Henry"). (*Id*. ¶ 29.) The reason given to Mr. Coleman for the refusal was that he did not submit a sealed official copy of his transcript. (*Id*. ¶ 44.) No one ever told Mr. Coleman that his applications were not being accepted because of a political reason or factor. (*Id*. ¶ 48.)

Mr. Coleman told Ms. Henry that the JTDC had a copy of his transcripts due to his prior employment there. (*Id*. ¶ 30; *see also* Pl's Add. Undisp. Facts ¶ 16.) Mr. Coleman also believes that Ms. McCain verified this information with Ms. Henry. (*Id*.) That said, Ms. McCain did not work in the Bureau of Human Resources of Cook County, was not present when Mr. Coleman applied for the two positions, and does not know what materials Mr. Coleman submitted as a part of his application. (Pl's Resp. Cook Cnty. Facts ¶¶ 31, 37.)

After Ms. Henry's initial refusal, Mr. Coleman spoke with her supervisor Doris Gershon, the Deputy Chief of Labor Relations in the Bureau of Human Resources ("Ms. Gershon"). (*Id*.) Mr. Coleman asked Ms. McCain to contact Ms. Gershon to verify that his official transcripts were on file with the JTDC. (Pl's Add. Undisp. Facts ¶16.) Ms. Gershon was willing to accept his Mr. Coleman's application, until she called her chief Mr. Gilmore. (*Id*. ¶ 13; *see also* Pl's Resp. Cook Cnty. Facts ¶¶ 39-40.) Mr. Gilmore told Ms. Gershon to refuse to accept Mr. Coleman's application as non-compliant. (*Id*.)

In Mr. Coleman's presence, Ms. Gershon explained to Mr. Gilmore that Mr. Coleman's transcripts were on file at the JTDC, presumably relaying Ms. McCain's message, but Mr. Gilmore still refused to accept Mr. Coleman's application. (Pl's Add. Undisp. Facts ¶ 19.) Mr.

Coleman believes that this refusal was due to Mr. Gilmore being a Stroger political appointee. (*Id*. ¶ 24.)[4]

Mr. Coleman did not speak to Mr. Gilmore personally the date his applications were rejected. (Pl's Resp. Cook Cnty. Facts ¶ 65.) Mr. Gilmore has never been a friend of Mr. Coleman, nor did Mr. Coleman know Mr. Gilmore personally. (*Id*. ¶¶ 53-54.) Mr. Coleman never discussed his political affiliations with Mr. Gilmore. (*Id*. ¶ 55.) During his tenure as Chief of Human Resources, Mr. Gilmore received *Shakman* training and was aware of the *Shakman* decree. (*Id*. ¶ 57.) Mr. Gilmore understood that conditioning, basing or knowingly prejudicing or affecting any term of governmental employment upon the basis of political reasons or factors violated the *Shakman* decree. (*Id*. ¶ 58.)

Shortly after the refusal of Mr. Coleman's application, Cook County HR allegedly reposted the position, changing the sealed transcript language. (Pl's Add. Undisp. Facts ¶ 22.) The only document supporting these facts, brought to the court's attention, is a July 20, 2007 Cook County job posting for "Business Manager". (Dkt. No. 184, Affidavit of Rickey Coleman, at 3.) That job posting states an applicant "[m]ust provide an official copy of a college/university/transcript, sealed in original official envelope within 14 days from date of Application Receipt." (*Id*.)

Under the Cook County Personnel Rules, in order for an applicant to qualify for any position, s/he must meet all the requirements specified by law, in the Cook County Personnel Rules and in the Notice of Job Opportunity. (Pl's Resp. Cook Cnty. Facts ¶ 32.) The Bureau of Human Resources may reject or disqualify an applicant if s/he lacks any of the requirements as

---

[4] The Court agrees with Defendants that the additional facts Mr. Coleman sets out, on Mr. Gilmore's rejection of Mr. Coleman's application (Pl's Add. Undisp. Facts ¶¶ 23, 66), are fatally conclusory at the summary judgment stage of the proceedings. *Lujan*, 497 U.S. at 888 (conclusory statements of fact afforded no weight for summary judgment).

set forth in Notice of Job Opportunity. (*Id.* ¶ 33.) Applicants are responsible for furnishing all information or materials requested in accordance with the Notice of Job Opportunity, and any applicant who fails to follow such instructions becomes ineligible for the position. (*Id.* ¶ 34.)[5]

Mr. Coleman does not know who else applied or was hired for the two positions. (*Id.* ¶¶ 45-46.) In spite of this, he maintains that his qualifications were better in comparison to anyone who was hired. (*Id.* ¶ 47.)

**The Appointment of Earl Dunlap**

As a consequence of the case *Jimmy Doe v. Cook County*, No. 99 C 3945 (N.D. Ill.), on August 7, 2007, Mr. Dunlap was appointed "Transitional Administrator" ("TA") of the JTDC to oversee, supervise, and direct all functions relating to the JTDC. (Pl's Resp. Dunlap Facts ¶ 8.) Mr. Dunlap remains in that capacity pursuant to the authority of the court. (*Id.* ¶ 9.) Mr. Dunlap had no connections to the political organizations of John Stroger, Todd Stroger, or the Eighth Ward Democratic political organization. (*Id.* ¶ 23.)

In his first year in the position as TA of JTDC, Mr. Dunlap focused on preparing a budget and assessing operations, before deciding how to reform the facility. (*Id.* ¶ 10.) For most of that period, he made no personnel changes, except where necessary for disciplinary reasons. (*Id.*) Once Mr. Dunlap began hiring again, he discovered the JTDC had no infrastructure for hiring new employees, and he created a re-staffing plan with judicial approval in the *Doe* case. (*Id.* ¶ 11.)

---

[5] Mr. Coleman's only objection to the facts Cook County submits concerning its Personnel Rules is that "the document was never produced in discovery and any use [of it] should be barred." (Pl's Resp. Cook Cnty. Facts ¶¶ 32-34.) In Reply (Dkt. No. 194, at 3 & Ex. 1), Cook County confirms that this document was in fact provided to him during discovery. Because Mr. Coleman fails to present any other basis for his factual denial, the previously cited paragraphs are deemed admitted. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.")

Pursuant to this staffing plan, Mr. Dunlap engaged a division of CareerBuilders.com, called Personify, to conduct an initial screening of applicants to ensure that the hiring process was fair and objective. (*Id*. ¶ 12.)[6] Mr. Dulap's goal was to create an objective, fair and reasonable hiring process to ensure employees had the requisite qualifications and experience, and completed objective testing. (*Id*. ¶ 13.) Mr. Dunlap recognized that the interview process was necessarily more subjective, but he strove to make hiring as clean as possible in terms of how JTDC went about hiring people. (*Id*.)

Mr. Dunlap believed the best way to take politics out of hiring at JTDC was to remove the County's Human Resources Department from the process. (*Id*. ¶ 12.) In his capacity as TA of the JTDC, Mr. Dunlap did not permit hiring decisions to be based on political considerations. (*Id*. ¶ 24.) Prior to the filing of this lawsuit, Mr. Dunlap was unaware that Mr. Coleman had applied or interviewed for any positions at the JTDC. (*Id*. ¶ 28.)

**Mr. Coleman's 2008 Application**

In April 2008, Mr. Coleman applied for the Team Leader position at the JTDC, and his application went to Rose Golden, the Director of Human Resources under the Probation Division of the Chief Judge's Office ("Ms. Golden"). (Def's Resp. Pl's Facts ¶ 50.) Mr. Coleman did not receive an interview. (*Id*. ¶ 53.) During this time, Mr. Dunlap and the JTDC were still relying on Cook County HR to some degree. (*Id*. ¶ 54.)

---

[6] In response to several of Mr. Dunlap's undisputed facts, Mr. Coleman merely admits that Mr. Dunlap or Ms. Welch testified to these facts. (Pl's Resp. Dunlap Facts, ¶¶ 12, 13, 19, 24, 25.) Presumably, Mr. Coleman's response is intended to suggest that this testimony is not to be believed. Mr. Coleman's response is improper under Local Rule 56.1. *See, e.g.*, *Michas*, 209 F.3d at 689; *Nicholas v. Allstate Ins. Co.*, No. 10-629, 2012 WL 182216, at *5 (N.D. Ill. Jan. 23, 2012) (Feinerman, J.) (Local Rule 56.1 "requires [the plaintiff] to support [] denial[s] with evidence."). As a result, the court exercises its discretion to deem these facts admitted. *See, e.g.*, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) (failure to comply with Local Rule 56.1 is "not a harmless technicality, but a mistake that our precedents (for good reason) have deemed fatal.").

All the interview notes and applicant files were turned over by Ms. Golden to Jennifer Koehler, a member of the JTDC staff. (*Id.* ¶ 55.) Ms. Golden testified that "Particularly I turned all the applicant files, everything, over to Detention when I ceased my involvement with them." (*Id.*) However, Mr. Dunlap did not produce any of these files in this case and has no idea what happened to them. (*Id.* ¶ 56.)

**Mr. Coleman's 2009 Applications and Interview**

Sometime before May 23, 2009, Mr. Coleman applied online for several JTDC positions listed on the CareerBuilders' website. (Def's Resp. Pl's Facts ¶ 33.) Again, CareerBuilders was handling recruitment, and setting up testing and interviews for applicants. (*Id.* ¶ 34.) On June 2, 2009, Mr. Coleman was notified by Felicia Watson of CareerBuilders that he was being considered for a position at the JTDC titled Recreation Worker. (*Id.* ¶ 35; *see also* Pl's Resp. Dunlap Facts ¶ 14.)

Mr. Coleman was interviewed by two individuals with the title Team Leaders. (*Id.* ¶ 14.) Mr. Coleman alleges the Team Leaders asked him about his previous employment at JTDC, and when Mr. Coleman told him he was laid off for political reasons, the Team Leaders stopped the interview, stating the Recreation Worker position was no longer available. (*Id.*) Mr. Coleman's only contact from the JTDC or CareerBuilders thereafter was an email he received telling him he did not get the Recreational Worker position. (Def's Resp. Pl's Facts ¶ 42.)

Mr. Coleman has admitted the Team Leaders, who interviewed him in 2009, were not working at the JTDC when he was laid off in 2007, nor were they aware of his political affiliations.[7] (Pl's Resp. Dunlap Facts ¶ 14.) Additionally, Mr. Coleman admits that he had no

---

[7] Mr. Dunlap sets forth this fact as undisputed (Dkt. No. 168, Dunlap Rule 56.1 Statement, ¶ 14), and in response Mr. Coleman denies the allegation by merely citing three pages of his own deposition transcript. (Pl's Resp. Dunlap Facts ¶ 14.) However, in this testimony, Mr. Coleman

basis to believe Earl Dunlap, as TA of the JTDC, was politically motivated to not hire Mr. Coleman in June of 2009.  (*Id.* ¶ 28.)[8]

In June 2009, Carrier Hegenderfer of Careerbuilder.com, the main facilitator onsite at JTDC ("Ms. Hegenderfer"), emailed Brenda Welch, one of Mr. Dunlap's Deputy TAs ("Ms. Welch"), concerning Mr. Coleman's rehire.  (*Id.* ¶ 17.)  Ms. Welch told Ms. Hegenderfer that she knew Mr. Coleman "very well."  (Def's Resp. Pl's Facts ¶ 38.)  Ms. Hegenderfer, ultimately, indicated to Ms. Welch that the two Team Leaders who interviewed Mr. Coleman did not find him suitable for the Recreation Worker position.  (Pl's Resp. Dunlap Facts ¶ 17.)

Mr. Coleman has admitted that there is no mention in that email of Mr. Coleman being terminated in retaliation for political activities or not being rehired for political considerations.  (*Id.*)  Additionally, Ms. Welch testified that she told her HR people to "forge on" with their recommendation of Mr. Coleman for a JTDC counselor position, as opposed to the Recreation Worker position that Mr. Coleman originally applied.  (Def's Resp. Pl's Facts ¶ 39.)

As Deputy TA, Ms. Welch was appointed by the court in the *Doe* case as Compliance Administer of JTDC, acting as an agent of the court, and tasked with ensuring JTDC was conforming to various corrective plans agreed to in *Doe* and approved by the court.  (*Id.* ¶ 18.)

---

admitted that he believed the Team Leaders knew of his alleged political firing was wholly speculative.  (Dkt. No. 168, Ex. 4, Coleman Dep. of Apr. 22, 2013, at 47-48.)  Again, because Mr. Coleman was required under Local Rule 56.1 to support his denial with specific supporting evidence, the court deems this fact admitted.  *See, e.g., Michas*, 209 F.3d at 689.

[8] Mr. Dunlap again states this fact to be undisputed (Dkt. No. 168, Dunlap Rule 56.1 Statement, ¶ 28), and Mr. Coleman responds that "ignoring the hiring preference from 2007 through 2009 and in 2010 until the approval of his hiring plan, reveals bias as Dunlap did not eliminate the preference until after Coleman's June 2009 applications."  (Pl's Resp. Dunlap Facts ¶ 28.)  As this court has previously stated, "parties must cite to the record to support a Local Rule 56.1 denial" and "[l]egal arguments or other argumentative answers are not sufficient."  *Sandefur v. Village of Hanover Park, Ill.*, 862 F.Supp.2d 840, 843 n.1 (N.D. Ill. 2012) (citing *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (Castillo, J.)).  Because Mr. Coleman provides no contravening facts, only argument, this court finds the facts contained in the previously cited paragraph admitted.

Ms. Welch had no relationship with the Stroger family, the 8th Ward Democratic Organization, the Cook County Democratic Party, or any other politician or political organization. (*Id.* ¶ 21.) She was also not aware of whether Mr. Coleman supported the Stroger family, the 8th Ward Democratic Organization, the Cook County Democratic Party or any other politician or political organization. (*Id.*)

Ms. Welch came to the JTDC with Mr. Fairman from the Illinois Department of Corrections ("IDOC"). (Pl's Add. Undisp. Facts ¶ 27.) According to Mr. Coleman, Mr. Fairman was another Stroger appointee, who brought other political people to the JTDC. (*Id.* ¶ 26, 31.) Ms. Welch, in addition, allegedly told Mr. Coleman that Mr. Fairman and his assistant Mr. Catchings did not like him. (*Id.* ¶ 32.) However, Plaintiff has admitted that Ms. Welch and Mr. Fairman were neither friends nor even acquaintances despite having worked at the IDOC. *See supra* fn. 4 (admitting allegations contained in Pl's Resp. Dunlap Facts ¶ 19). The record shows that the two were such distance acquaintances that, prior to Ms. Welch being appointed to the JTDC, the two had only met once, years before at an industry conference. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial responsibility of identifying materials in the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1). "To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor." *Fleishman v. Continental Case Co.*, 698 F.3d 598, 603 (7th Cir. 2012). In other words, it is the nonmoving party's burden "to identify specific

facts in the record that demonstrate[ ] a genuine issue for trial." *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 647 (7th Cir. 2011). When ruling on a motion for summary judgment, the court "constru[es] all facts and draw[s] reasonable inferences in the light most favorable to" the nonmoving party. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013).

## ANALYSIS

### 1. Cook County's Rejection of Mr. Coleman's June 2007 Job Applications

Again, the only claim remaining against Cook County is a *Shakman* claim, based on Mr. Gilmore's rejection of Mr. Coleman's job application materials in June 2007. (Dkt. No. 132, MTD Order, Feb. 14, 2013.)[9]

Preliminarily, in Mr. Coleman's "Combined Response in Opposition to the Defendants' Motions for Summary Judgment" (Dkt. No. 185, "Pl's Opp'n"), Mr. Coleman sets out several broad factual statements some without any cited support, and others without proper citation to the parties' underlying Rule 56.1 statements of undisputed facts. This court in its discretion disregards such unsupported statements. As stated in, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994), "there is nothing improper in the court enforcing [Rule 56.1] strictly", because it is intended to significantly benefit "the court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information." *Id.*[10]

---

[9] Mr. Coleman asserts without factual support that he applied for open positions at the JTDC and was not accepted for re-hire in June 2007, April 2008, and June 2009. (Dkt. No. 132, MTD Order of Feb. 14, 2013, at 2.) Mr. Dunlap was appointed TA of the JTDC in August 2007, and authorized through a federal court order to implement and enforce other federal court orders. (*Id.*) Due to Mr. Dunlap's authority over the JTDC, this court held that Cook County could not fairly be held liable, for alleged political discrimination at the JTDC, subsequent to Mr. Dunlap's appointment. (*Id.*)

[10] The following is a non-exhaustive list of such statements: (1) even after Willie Ross left the JTDC, the "Stroger political machine was still operating" in Cook County until at least 2010,

In addition to various unsupported statements, Mr. Coleman's claim against Cook County rests largely on what he calls a "politically charged" environment in Cook County when his application was rejected. (*See* Opp'n at 12-13.) According to Mr. Coleman, politics must have been a material factor in the rejection of his job application, because: (1) *Shakman* claims continue to be filed and won, (*id*. at 12); (2) Willie Ross' statement, urging Mr. Coleman to support Stroger or risk his job, was indicative of the *status quo* in Cook County, (*id*.); and (3) there was tension between floor managers (Mr. Coleman's position) and their supervisors due to different political affiliations, (*id*.). Such circumstantial assertions of a working environment that was "politically charged" in Cook County hiring is not enough for Mr. Coleman's case to survive summary judgment. *See Fleishman v. Continental Case Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (requiring non-movant to provide sufficient evidence to support a jury verdict in its favor).

For what he purports to be a *Shakman* First Amendment claim to survive summary judgment, Mr. Coleman must make a threshold showing that the material facts are disputed that Cook County, and more specifically, its decision-maker Mr. Gilmore, was aware of Mr. Coleman's political affiliations or status. *See Gunvill v. Walker*, 585 F.3d 979, 984 (7th Cir. 2009) ("In order to demonstrate that the defendants were motivated by political affiliation in determining which employees to terminate, the plaintiffs must first show that the defendants knew of their association with the Republican party."); *Hall v. Babb*, 389 F.3d 758, 762-63 (7th Cir. 2004) ("failure to offer evidence that would have shown that" hiring decision-makers "knew about the political background of the two applicants, or that the hiring decision was manipulated

---

(Pl's Opp'n at 3); (2) Mr. Fairman and Mr. Catchings filed false charges against Mr. Coleman, which were initially sustained by Mr. Berger, and consequently required arbitration (*id*. at 3-4); (3) Mr. Coleman went on disability leave, because of the stress these arbitrations caused, (*id*. at 4); (4) the record shows that Mr. Coleman was a good employee until his termination in March 2007, (*id*. at 9); and (5) Mr. Coleman was replaced by someone with political ties, (*id*. at 13).

by one member who possessed such knowledge, dooms [the] case."); *see also Holmes v. Potter*, 384 F.3d 356, 362 (7th Cir. 2004) ("Usually, an employer's lack of knowledge about a protected category rings a death knell for discrimination claims.")

None of the above facts Mr. Coleman cites tends to establish that Mr. Gilmore knew Mr. Coleman's politics and discriminated against him. Just because other courts have found *Shakman* violations in other cases, says nothing about whether Mr. Gilmore improperly discriminated against Mr. Coleman. For this court to rule otherwise, would allow any prospective *Shakman* plaintiff to survive summary judgment, simply by pointing to past meritorious claims of others. Additionally, a lone statement from Mr. Coleman's previous supervisor at the JTDC Willie Ross, who was relieved of his duties in 2005, says nothing about the motivations of the Cook County Human Resources Chief in 2007. General political tension between floor managers, and their supervisors at the JTDC, similarly says nothing about whether Mr. Gilmore, a Cook County HR representative, improperly discriminated against Mr. Coleman.

The ultimate basis for this court's judgment, however, does not rest on the weakness of the above circumstantial evidence, or any other indirect evidence. Instead, this court finds that Mr. Coleman cannot prove a claim against Cook County, due to his own admissions. While employed at the JTDC, Mr. Coleman admits that he never communicated his political affiliations or beliefs to anyone at any time, never told anyone whether he supported Stroger, and was never part of any political organization. (Pl's Resp. Cook Cnty. Facts ¶¶ 11, 72-73.) Mr. Coleman also never discussed his political affiliations with Mr. Gilmore, nor did Mr. Coleman have any relationship with Mr. Gilmore. (*Id*. ¶¶ 53-55.) In light of these admissions, Mr. Gilmore would have had no knowledge of Mr. Coleman's politics that he could utilize as a basis to discriminate against Mr. Coleman.

Even though this court finds, as a factual matter, that Mr. Coleman's admissions doom his claim, the court also finds unpersuasive Mr. Coleman's additional presentations of indirect evidence to try to prove or raise a material factual dispute regarding Mr. Gilmore's discriminatory intent. According to Mr. Coleman, approximately three months after being fired, Mr. Coleman presented applications for two positions to the Cook County HR Department, which were both rejected on the basis that he lacked an official transcript sealed by his college. (Pl's Opp'n at 4-6.) The ultimate decision-maker, Mr. Gilmore, was a political appointee of Stroger. (*Id.*) Mr. Gilmore made his decision even though Ms. McCain, a JTDC HR person, informed Cook County's HR personnel that Mr. Coleman's official transcripts were on file at the JTDC. (*Id.*) After this rejection, a subsequent Cook County job posting at the JTDC contained language altering an applicant's official transcript obligations. (*Id.*)

Again, just because Mr. Coleman asserts he previously suffered improper employment discrimination in his firing, does not mean that every time he subsequently applied for a job at the JTDC he suffered political discrimination. To rule otherwise, would lead to the absurd result that every Cook County employee, suffering a past *Shakman* violation, could proceed to trial on new *Shakman* claims, every time the employee submitted a subsequent employment application that was rejected.

Similarly, assuming that Mr. Gilmore was a Stroger appointee, and crediting Mr. Coleman's various allegations that Stroger sought to politically affect hiring, it does not follow that Mr. Gilmore was captive to Stroger. To hold otherwise, would effectively relieve Mr. Coleman of the requirement to demonstrate that the alleged discriminating decision-maker knew and acted with knowledge of Mr. Coleman's politics. *See Gunvill*, 585 F.3d at 984 (7th Cir. 2009); *Hall*, 389 F.3d at 762-63. Mr. Coleman could simply point to one alleged *Shakman*

violator, and commute that violator's intent to another decision-maker, without offering any independent evidence of shared political aims among the two.

Mr. Gilmore's rejection of Mr. Coleman's applications, in spite of Ms. McCain's representation, would also not permit Mr. Coleman's case to survive summary judgment. There is overwhelming evidence that Mr. Gilmore's rejection was based on a good faith interpretation of Cook County's Personnel Rules. As Mr. Coleman has admitted, for an applicant to qualify for any position, a person must meet all requirements specified in the Cook County Personnel Rules and in the Notice of Job Opportunity. *See supra* fn. 5. Under Cook County Personnel Rules, the Bureau of Human Resources may reject or disqualify an applicant if he or she lacks any of the requirements set forth in the Notice of Job Opportunity. *Id*. It is the applicant's responsibility to furnish all information and materials requested in accordance with the Notice of Job Opportunity and any instructions furnished by the Bureau of Human Resources. *Id*. Any applicant, who fails to follow such instructions, becomes ineligible for the position. *Id*.

Mr. Coleman has admitted facts concerning his application, when coupled with Cook County's above policies, that would lead to Mr. Gilmore rejecting his application. One of the minimum qualifications, appearing in bold lettering, for the positions Mr. Coleman applied for was that the applicant "must provide a sealed official copy of transcripts" with his or her application. (Pl's Resp. Cook Cnty. Facts ¶¶ 24, 26.) Mr. Coleman admits that the transcripts he submitted on June 21, 2007 were not in a sealed envelope that had been sealed by his college. (*Id*. ¶ 42.)

Mr. Coleman attempts to manufacture a factual issue, by arguing that he complied with this requirement, because he submitted a copy of his official transcript and had Ms. McCain vouch that such a transcript was on file at the JTDC. (Pl's Add. Undisp. Facts ¶ 12.) The

language of the above requirement, however, clearly states that Cook County required that Mr. Coleman provide an official copy of his transcripts sealed by his college with his application. (Pl's Resp. Cook Cnty Facts ¶¶ 24, 26.) This court is not required to ignore this common sense interpretation of the language or its judicial experience in interpreting a party's intent when demanding official transcripts. *See United States v. Barnett*, 939 F.2d 405, 407 (7th Cir. 1991) (holding district judge making "factbound determinations are not required to divorce themselves from common sense or to ignore what is perfectly obvious.") Simply put, the language in the Job Postings at issue did not state that Mr. Coleman should submit an alleged copy of his transcript, which he could potentially have altered, or have a friend at the JTDC call Cook County HR, on the last day of the application period, claiming that Mr. Coleman's official transcript was on file.

The fact that Cook County later altered its transcript language in a subsequent job posting says nothing, as a factual matter, about the requirements in place at the time Mr. Coleman tendered his application. This court finds that edited language merely makes explicit that Cook County required an official transcript copy sealed by the relevant college or university. (Dkt. No. 184, Affidavit of Rickey Coleman, at 3.) Additionally, just because Cook County may have relaxed the transcript requirement, allowing an applicant to submit an official transcript within 14 days of submitting an application, says nothing about whether such a procedure was available to Mr. Coleman for his application in June 2007. (*Id*.)

### 2. Earl Dunlap and Mr. Coleman's Job Applications in 2008 and 2009

#### a. *Mr. Coleman's 2008 Job Application*

As discussed above, in April 2008, Mr. Coleman applied for the Team Leader position at the JTDC, but Mr. Coleman was not interviewed for the position. (Def's Resp. Pl's Facts ¶¶ 50,

53.)  Ms. Golden, HR Director for the Chief Judge's Office, received Mr. Coleman's application, and she later turned her interview notes and application materials over to Jennifer Koehler of the JTDC.  (*Id*. ¶ 55.)  However, Mr. Dunlap did not produce any of these files in this case, and he has no idea what happened to them.  (*Id*. ¶ 56.)    During the relevant time period, Mr. Dunlap was relying on Cook County HR to an extent.  (*Id*.)

Mr. Dunlap seeks summary judgment of Mr. Coleman's *Shakman* claims, including Mr. Coleman's allegations concerning his April 2008 JTDC application.  (Dkt. No. 167, Def. Dunlap's Mot. Sum. J., at 17.)   In spite of this fact, Mr. Coleman has done nothing to preserve this claim other than: (1) state in a single sentence without citation that Ms. Welch was involved "at every stage of the alleged workplace controversies in 2008"; (2) recite the above facts; and (3) state that Mr. Dunlap cannot "show[] that [Mr. Coleman] was treated fairly", because there are "no records of Plaintiff's application".  (Pl's Opp'n at 6-7, 17-19.)

This court is under no obligation to consider Mr. Coleman's conclusory and unsupported claim that Ms. Welch somehow nefariously affected his April 2008 application.  The court is not required to heed conclusory statements at the summary judgment stage.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (holding that conclusory statements of fact are afforded no weight at the summary judgment stage.)  There is simply no evidence before this court that Ms. Welch had any knowledge or involvement whatsoever with Mr. Coleman's April 2008 application.

The various facts Mr. Coleman recites also fail to save his April 2008 claim from summary judgment.  Just because Cook County HR was involved, to some undefined extent in JTDC hiring in 2008, does not overcome Mr. Coleman's various admissions that Mr. Dunlap instituted proper procedures for JTDC hiring.  Once Mr. Dunlap began hiring, he created a re-

staffing plan with judicial approval. (Pl's Resp. Dunlap Facts ¶ 11.) Mr. Dunlap's goal was to create an objective, fair and reasonable hiring process to ensure employees had the requisite qualifications and experience, and completed objective testing. (*Id*. ¶ 13.) Mr. Dunlap recognized that the interview process was necessarily more subjective, but he strove to make hiring as clean as possible in terms of how JTDC went about hiring people. (*Id*.) Importantly, in his capacity as TA of the JTDC, Mr. Dunlap did not permit hiring decisions to be based on political considerations. (*Id*. ¶ 24.)

Mr. Dunlap's inability to produce files, from Mr. Coleman's April 2008 application, does not alter this court's analysis. First, Mr. Coleman utterly fails to develop these facts in his briefing, and therefore the court considers any potential argument waived. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (holding perfunctory and undeveloped argument is waived); *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) (substantially similar). Second, even if the court were to construe Mr. Coleman's undeveloped statements as a potential request for an adverse inference, Mr. Coleman is not entitled to such a holding. *See, e.g.*, *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (holding adverse inference for failure to produce requires showing of intentional destruction of documents in bad faith). Mr. Coleman sets forth no facts showing that Mr. Dunlap's failure to produce was the product of bad faith destruction of documents.

### b. Mr. Coleman's 2009 Applications

Again, around May 23, 2009, Mr. Coleman applied online for multiple JTDC positions through CareerBuilders, which at that time was handling the JTDC's initial applicant screening. (Def's Resp. Pl's Facts ¶¶ 33-34.) Mr. Coleman was notified by CareerBuilders that he was being considered for a position entitled Recreation Worker, and he was later interviewed by two

Team Leaders. (*Id.* ¶ 35; *see also* Pl's Resp. Dunlap Facts ¶ 14.) Mr. Coleman states the Team Leaders asked him about his previous employment at JTDC, and when Mr. Coleman told him he was laid off for political reasons, the Team Leaders stopped the interview, stating the position was no longer available. (*Id.*)

It is readily apparent, from Mr. Coleman's own factual account, that Mr. Dunlap personally did not decide whether Mr. Coleman should be hired for the Recreational Worker position, and furthermore Mr. Coleman's own admissions confirm this holding. Mr. Coleman admits that he had no basis to believe Mr. Dunlap, as TA for the JTDC, was politically motivated to not hire Mr. Coleman in June of 2009. (Pl's Resp. Dunlap Facts ¶ 28.) Additionally, Mr. Coleman admits that, prior to the filing of this lawsuit, Mr. Dunlap was not even aware of Mr. Coleman's applications or interviews at the JTDC. (*Id.* ¶ 28.)

Given these factual admissions, Mr. Coleman consequently attempts to convince the court to hold Mr. Dunlap liable under various *respondeat superior* theories. (Pl's Opp'n at 16-18.) One such theory is that the Team Leaders improperly discriminated against Mr. Coleman, due to politics, when they ended Mr. Coleman's interview and/or rejected his candidacy. However, these allegations cannot save Mr. Coleman's claim from summary judgment, due to Mr. Coleman's own admissions. Mr. Coleman has admitted the Team Leaders, who interviewed him in 2009, did not work at the JTDC when he was laid off in 2007, and more importantly they were not aware of his political affiliations. *See supra* fn. 7. Without this predicate knowledge, the Team Leaders could not commit a *Shakman* violation, by discriminating against Mr.

Coleman on the basis of his politics. *See, e.g., Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992).[11]

Because the above theories must fail, Mr. Coleman spends much of his briefing arguing that Mr. Dunlap should be liable for the interference of Ms. Welch and Mr. Berger, Deputy TA's at the JTDC, with Mr. Coleman's applications. (Pl's Opp'n at 3-4, 7-8, 16-18.) The only tangible document Mr. Coleman cites as alleged evidence of such interference is a June 2009 email exchange between Carrier Hegenderfer of Careerbuilders ("Ms. Hegenderfer"), and Ms. Welch concerning Mr. Coleman's potential rehire. (Pl's Resp. Dunlap Facts ¶ 17.)

In this email exchange, Ms. Hegenderfer says to Ms. Welch that the two Team Leaders who interviewed Mr. Coleman did not find him suitable for the Recreation Worker position. (Pl's Resp. Dunlap Facts ¶ 17.) Ms. Welch additionally told Ms. Hegenderfer that she knew Mr. Coleman "very well." (Def's Resp. Pl's Facts ¶ 38.) However, Ms. Welch stated that she would reserve her remarks until after the interviewers' commented on Mr. Coleman's application. (Pl's Opp'n at 7.) Ms. Hegenderfer recommended Mr. Coleman "as backfill on Phoenix" at the JTDC, (*id*.), and Ms. Welch told Ms. Hegenderfer to "forge on" with that recommendation. (Def's Resp. Pl's Facts ¶ 39.)

The above exchange, on its face, does not advance Mr. Coleman's *respondeat superior* theory. Ms. Welch saying that she knew Mr. Coleman well, but that she would reserve comment, is clearly not an overt attempt to interfere with Mr. Coleman's potential hiring. This is especially true, considering Ms. Welch told Ms. Hegenderfer to "forge on" with Mr. Coleman's potential hiring for another position. (*Id*.)

---

[11] Speculation that the Team Leaders must have known Mr. Coleman's politics based on his disclosure that he was fired for political reasons does not change this analysis. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

These communications also do not create *respondeat superior* liability, in spite of Mr. Coleman's theory that Ms. Welch's demurral was actually a form of sinister interference. Even assuming Ms. Welch had some sort of ill-will toward Mr. Coleman, a fact Mr. Coleman has failed to support, Ms. Welch's response in reserving comment would be entirely permissible. *See Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (holding liability imposed on an employer for reliance on an improperly motivated subordinate only lies upon a showing "that ***an employee with discriminatory animus provided factual information or other input*** that may have affected the adverse employment action." (emphasis added)). Simply put, the essence of Ms. Coleman's act was to abstain from providing any such information or input.[12]

Again, Mr. Coleman's vague attempts to conjure up some sort of discriminatory intent on the part of Ms. Welch in June 2009 based on her fidelity to Mr. Fairman must also fail. Ms. Welch and Mr. Fairman did work at the Illinois Department of Corrections. (Pl's Add. Undisp. Facts ¶ 27.) Additionally, according to Mr. Coleman, Ms. Welch told Mr. Coleman that Mr. Fairman and his assistant Mr. Catchings did not like him. (*Id.* ¶ 32.) However, Plaintiff has admitted that Ms. Welch and Mr. Fairman were neither friends nor even acquaintances despite having previously worked for the Department of Corrections. *See supra* fn. 4 (admitting allegations contained in Pl's Resp. Dunlap Facts ¶ 19). The two were such distance acquaintances that, prior to Ms. Welch being appointed to the JTDC, they had only met once years before at an industry conference. (*Id.*)

---

[12] To hold otherwise would lead to a manifestly absurd result. For the sake of argument, assume a subordinate like Ms. Welch bears improper political animus toward a job applicant, like Mr. Coleman. Given that fact, it is entirely unrealistic to assume, or obligate, the subordinate to provide a positive recommendation for the applicant. At best, as a policy matter, a court could hope the improperly motivated subordinate would abstain from considering the applicant—Ms. Welch's exact response here. If *respondeat superior* liability lies, even where the subordinate has abstained from commenting, than a court essentially creates liability based merely on a *mens rea* without any effectuating action.

Mr. Coleman's *respondeat superior* theory, that Deputy TA Berger interference with Mr. Coleman's applications, fails as it is even more speculative. *Amadio*, 238 F.3d at 927 ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact."). Mr. Coleman merely alleges: (1) Mr. Berger arrived at the JTDC around the same time as Mr. Fairman, (Pl's Opp'n at 3); (2) the two worked at the Department of Corrections, (*id.*); and (3) Mr. Berger sustained false charges against Mr. Coleman in arbitration, (*id.* at 4). Even though Mr. Berger and Mr. Fairman worked at the Department of Corrections, without further evidence, it is entirely speculative that Mr. Berger would discriminate against Mr. Coleman on Mr. Fairman's behalf. And, as discussed above, this court is not required to consider Mr. Coleman's conclusory allegation that Mr. Berger sustained "false" charges against him. *See, supra* fn. 3.

<u>CONCLUSION</u>

For the foregoing reasons, this court grants Defendants' motions for summary judgment, (Dkt. Nos. 162, 166.), and enters judgment against Mr. Coleman's remaining *Shakman* claim, (Dkt. No. 62, Am. Compl., Count I). Mr. Coleman has failed to identify facts in the record, demonstrating a genuine issue for trial, about his applications to the JTDC being rejected in June 2007, April 2008, and June 2009. Judgment is ordered entered in favor of the Defendants and against plaintiff Ricky Coleman. Defendants' costs are to be borne by plaintiff Rickey Coleman. Civil case terminated.


ENTER:

JAMES F. HOLDERMAN
United States District Court Judge

23

Date:   May 6, 2014